40344. FIUMEFREDDO v. SCUDDER et al.

BELL, Justice.

The controlling issue in this appeal is whether the trial court properly granted summary judgment to the appellees based on the Simultaneous Death Act (the Act). OCGA § 53-11-1 et seq. (Code Ann. § 113-2901 et seq.).

On December 12, 1982, Charles Scudder and Joseph Odum were murdered in Scudder's home in Chattooga County, Georgia. See *West v. State,* 252 Ga. 156 (313 SE2d 67) (1984) (appeal from conviction for murders of Scudder and Odum). Scudder's will left all of his personal property and the residue of his estate "[t]o my friend Joseph Odum." Article VII of Scudder's will provided that "I hereby acknowledge that at the time of execution of this Will, I have three surviving children. It is my intention not to provide anything for my said surviving children under or pursuant to this Will, and it is further my intention that my said surviving children take nothing from my estate. It is my intention by this Will to provide for my good friend Joseph Odum, to the exclusion of all other persons."

Following the murders, Mary Fiumefreddo, Odum's sister and the appellant in this court, petitioned the Probate Court of Chattooga County to probate Scudder's will and to appoint her administratrix with the will annexed. Scudder's relatives, the appellees, caveated, contending that the facts of the murders showed either that Odum predeceased Scudder or that the sequence of deaths could not be determined, thus necessitating the application of the Simultaneous Death Act. Since Odum had no lineal descendants, they contended, the result of either of the above determinations was that Scudder died intestate, and that they, as his heirs, were entitled to inherit and administer his estate.

The probate court found that Scudder predeceased Odum, and appointed Fiumefreddo administratrix with the will annexed. The

appellees appealed to the superior court, where cross-motions for summary judgment were filed. The trial court subsequently granted the appellees' motion and denied the appellant's. Although the court acknowledged that circumstantial evidence can be sufficient to establish the fact that two deaths were not simultaneous, and, hence, sufficient to avoid the operation of the Simultaneous Death Act, the court nevertheless found that the evidence in this case was insufficient as a matter of law to raise a material issue of fact concerning whether either of the deceaseds had survived the other. The court therefore applied the Simultaneous Death Act, and ruled that Scudder's property passed to the appellees by intestacy. Fiumefreddo appeals from both the denial and grant of summary judgment. We affirm the denial of Fiumefreddo's motion for summary judgment, but reverse the grant of summary judgment to the appellees.

1). The appellant contends that the trial court erred in denying her motion for summary judgment for two reasons.

a). She first argues that, even assuming Odum predeceased Scudder, the will, as a matter of law, should have been admitted to probate because it expressed an intention on the part of Scudder to the effect that, if Odum predeceased him, the legacy to Odum should not lapse, but should instead pass to the appellant and her sisters as substitute beneficiaries.

Normally when a sole legatee under a will predeceases the testator and leaves no lineal descendants, a lapse of the legacy occurs, and the testator's estate passes to his or her heirs at law. *Lawson v. Hurt,* 217 Ga. 827 (125 SE2d 480) (1962). See OCGA § 53-2-103 (Code Ann. § 113-812) (Georgia's anti-lapse statute); Redfearn, Wills, Ga., § 156 (4th Ed.). However, a testator may prevent such a lapse by providing for the disposition of his or her estate in the event of the death of the legatee. *Foster v. Hardee,* 135 Ga. 591 (69 SE 1110) (1910).

In the instant case, Odum, the sole legatee under Scudder's will, died without any lineal descendants. Thus, if Odum predeceased Scudder, and if Scudder did not provide for the disposition of his property in the event of Odum's death, an intestacy would occur. On its face, Scudder's will evidences no such disposition. Fiumefreddo argues, however, that Scudder, by providing in his will for Odum to receive his estate to the exclusion of all other persons, impliedly expressed an intention that, if Odum predeceased him, Odum's heirs should be substitute beneficiaries. We disagree. Scudder's will expresses the clear and single testamentary scheme that his property go to Joseph Odum, and it provides for no other disposition in the event of Odum's death. If Scudder had intended for Odum's heirs to

take his estate upon Odum's death, he could have easily so provided. Because of the unambiguous testamentary scheme evidenced by the will, we find the trial court correctly found that Scudder did not intend for appellant and her sisters to be substituted beneficiaries in the event of Odum's death. See *Hungerford v. Trust Co. of Ga.,* 190 Ga. 387 (9 SE2d 630) (1940). Therefore, the trial court correctly denied the appellant's motion for summary judgment.

b). The appellant argues that the trial court erred in denying her motion for summary judgment for an additional reason. She apparently contends that Scudder, by stating in his will that he wished his children not to inherit and that he intended to provide for Odum to the exclusion of all others, expressed the intention, within the meaning of OCGA § 53-11-5 (Code Ann. § 113-2905), that, regardless of the time and manner of his and Odum's deaths, Odum should be presumed to have survived him, so that Odum's heirs would be entitled to his estate. She thus concludes that Odum should have been deemed to have survived Scudder, and that Scudder's will should have been admitted to probate. This argument is without merit, as Scudder's will, as noted in Division 1, supra, evidences only a single testamentary scheme to provide for Joseph Odum, and is completely silent as to any presumption of survivorship, see § 53-11-5 (Code Ann. § 113-2905). To reach the conclusion urged by Fiumefreddo would entail a strained and unwarranted construction of Scudder's will, and we decline to do so.

2). Fiumefreddo next argues that there was enough evidence presented to the superior court showing that Odum survived Scudder to create a factual issue as to the priority of death, and thus to render summary judgment based on the Act inappropriate. We agree.

OCGA § 53-11-2 (Code Ann. § 113-2902), the applicable portion of the Act, provides that "[w]hen title to property or the devolution thereof depends upon priority of death and there is no sufficient evidence that the persons have died otherwise than simultaneously, the property of each shall be disposed of as if he had survived. . . ." The resolution of the dispute now before us turns upon the interpretation of the operative clause of § 53-11-2 (Code Ann. § 113-2902), providing that that section of the Act is applicable if "there is no sufficient evidence that the persons have died otherwise than simultaneously."

This clause has yet to be interpreted in this state; however, the Act provides a principle to guide us in deciding the issue. OCGA § 53-11-6 (Code Ann. § 113-2907) directs that "[t]his chapter shall be so construed and interpreted as to effectuate its general purpose to make uniform the law in those states which enact it." Other jurisdictions have passed upon the clause now in issue and have

reached generally the same results.

"The Act is not a rule of evidence, as such, but one of substantive law that governs the devolution of property under certain circumstances. [Cits.]" In re Estate of Moran, 395 NE2d 579 (1) (2) (Ill. 1979); Brundige v. Alexander, 547 SW2d 232 (3) (Tenn. 1976). A majority of courts have construed the operative clause of the Act to mean that the Act becomes applicable if the order of the decedents' deaths cannot be determined by sufficient evidence. Matter of Campbell, 641 P2d 610, 613 (Or. App. 1982); Estate of Wien, 441 F2d 32, 35 (5th Cir. 1971); In re Estate of Moran, supra, 395 NE2d at 581; Smith v. Smith, 282 NE2d 412 (2, 3) (Mass. 1972).[1] Consistent with this interpretation, the burden is on the party whose claim depends upon survivorship to prove by a preponderance of the evidence that the person upon whom his or her claim depends survived the other decedent. Matter of Campbell, supra, 641 P2d at 613-14; In re Estate of Moran, supra, 395 NE2d at 581; In re Estate of Schmidt, 67 Cal. Rptr. 847, 852 (1968); Smith v. Smith, supra, 282 NE2d at 414. We agree with the above interpretation of the Act and with the assignment of the burden of proof at trial such an interpretation entails.

Before deciding whether the trial court properly applied the Simultaneous Death Act pursuant to the appellees' motion for summary judgment, we must review both certain principles applicable to motions for summary judgment and the evidence presented to the court concerning the murders of Scudder and Odum. On a motion for summary judgment, regardless of which party has the burden of proof at trial, the burden is on the party moving for

---

[1] It has been suggested that operative clauses such as that of § 53-11-2 (Code Ann. § 113-2902) should be applied literally, thus rendering the Act inapplicable unless the evidence supports the conclusion that the decedents died at the same instant. Matter of Campbell, 641 P2d 610, 613, fn. 9 (Or. App. 1982); Estate of Wien, 441 F2d 32, 35, fn. 1 (5th Cir. 1971). A majority of courts have rejected this interpretation, finding it inconsistent with the purpose of the Act, Matter of Campbell, supra, 641 P2d at 613, fn. 9; Estate of Wien, supra, 441 F2d at 35, fn. 1, which clearly is to solve the difficult problem of how to determine the proper devolution of property when distribution depends upon the order of death, and the circumstances are such that the order of death is not ascertainable. See Vol. 8 A, Uniform Laws Annotated, Simultaneous Death Act, Prefatory Note; Matter of Campbell, supra, 641 P2d at 615, fn. 9; Estate of Wien, supra, 441 F2d at 35, fn. 1. As has been noted by the courts, a literal interpretation of the Act would render it virtually meaningless, as it would force courts, in cases where it is improbable that the parties died simultaneously, but extremely difficult to ascertain the order of death, to undertake to decide who died first, no matter how difficult the task. Matter of Campbell, supra; 641 P2d at 615, fn. 9; Estate of Wien, supra, 441 F2d at 35, fn. 1.

summary judgment to show that there is no genuine issue of material fact, and all evidence adduced on the motion is to be construed most strongly against the movant. *Martin v. Citizens &c. Nat. Bank,* 248 Ga. 174 (1) (281 SE2d 509) (1981); *Tri-Cities Hospital Auth. v. Sheats,* 247 Ga. 713, 714 (279 SE2d 210) (1981). Moreover, where the evidence on summary judgment is ambiguous or doubtful, the party opposing the motion is to be given the benefit of all reasonable doubts and all favorable inferences that can be drawn from the evidence. *Eiberger v. West,* 247 Ga. 767 (1) (a) (281 SE2d 148) (1981); *Burnett Ford, Inc. v. Hayes,* 227 Ga. 551, 552-53 (181 SE2d 866) (1971); *North v. Toco Hills,* 160 Ga. App. 116, 119 (286 SE2d 346) (1981).

As for the evidence presented to the court, we turn first to the testimonies given by Dr. James Dawson and Kelly Fite at the probate hearing. Dawson, the Assistant Director of the Georgia Crime Laboratory, observed the crime scene and performed autopsies on the bodies of Scudder and Odum, which were discovered four days after the murders. He testified that Scudder died of gunshot wounds to the head and that he removed four .22 caliber bullets from Scudder's head. He also testified that Odum was shot five times in the area of the head behind the left ear, and that he removed five .22 caliber bullets from Odum's head. Based on the evidence gathered from the crime scene and the autopsies, he concluded that he could not determine which of the victims died first.

Kelly Fite, a firearms examiner with the crime laboratory, testified that he examined both a .22 caliber rifle recovered from the car driven by one of the murderers and the bullets which Dawson removed from Scudder and Odum. He was of the opinion that the four bullets taken from Scudder were fired from the rifle, and that of the five bullets removed from Odum, two were fired from the rifle, two probably were fired from the rifle, and one was not. He testified that the latter bullet was a .22 caliber short bullet, whereas the others were .22 caliber long rifle bullets.

There was evidence that on December 12, 1982, Tony West, Kenneth Brock, a/k/a Avery Lawrance, Teresa Hudgins, and Joey Wells went to Scudder's home in Chattooga County. Scudder's property contained both a main house, in which he and Odum lived, and a guest house. Teresa Hudgins testified at the probate hearing, and both she and Joey Wells were subsequently deposed for purposes of the appeal to the superior court. Hudgins testified that, when she and the other three approached Scudder's house in their car, Scudder came out of the main house and escorted them to the guest house, where Scudder was tied up with sheets, and where Lawrance obtained a .22 caliber rifle. Scudder was asked who was in the main house, and he replied that Odum was. Hudgins said that Lawrance

then left the guest house; that shortly thereafter she heard several shots; and that when Lawrance came back to the guest house about ten to fifteen minutes later he said that he had killed the man in the main house. Hudgins testified that, with Scudder still bound, they all then went to the main house, where, after entering the house through the kitchen door, Hudgins saw Odum lying in a pool of blood.

Hudgins testified that approximately thirty-five minutes after Odum was shot, West shot Scudder several times with the rifle, and that Scudder fell beside or close to Odum. She said that after Scudder was shot, Avery and West searched the house, and loaded their car with certain valuables. According to her testimony, Scudder began moaning and gurgling blood before they left, and Lawrance, taking a .22 caliber pistol he had found in the house, said that he was going to finish him off. She said that she could see Lawrance as he was standing near the bodies, and that Scudder and Odum were both lying close to him. She said that she heard two shots fired but that she could not, from where she was sitting, see the bullets hit anyone. She also testified that these last pistol shots were fired about thirty minutes after Scudder was first shot. She said that Odum did not move or exhibit any signs of life while she was in the house.

Hudgins was also questioned concerning the position of Odum's body. She initially said that, when she first went in the main house, Odum was lying mostly in the kitchen, near a pool of blood on the kitchen floor, and partly in the dining room area, which separated the kitchen from the library. She subsequently testified that when she left the house Odum was lying completely in the dining room area, with his head near the entrance to the library and his feet near the entrance to the kitchen. Crime scene photographs show the body lying in the latter position in a pool of blood on the kitchen floor. Despite these indications of a shift in the position of Odum's body, Hudgins also said that she never saw Odum move, be moved, or show any signs of life, and that his body was located in the same position when she entered the house as when she left the house.

The salient points of the testimony of Joey Wells concern his recollection of the position of Odum's body and of the identity of the man Lawrance shot with the .22 caliber pistol. Wells maintained that, when he, West, Lawrance, Hudgins, and Scudder went to the main house from the guest house, Odum's body was lying in the dining room area between the kitchen and the library. Upon being shown several crime scene photographs, he stated that Odum's body was in the position shown in the photographs when he first entered the main house and when he left. Wells also stated that he was sure that Lawrance fired two pistol shots into Scudder, but that it was possible that the pistol was shot more than twice. He stated that he heard

Scudder gurgling, and that Lawrance shot him with the pistol to finish him off. Moreover, he said that Odum did not gurgle, move, or show any signs of life while he was in the house. However, in a statement given to the police on December 17, 1982, five days after the killings, Lawrance said that the black haired man (Odum) started moaning and that Lawrance shot him with the pistol. In response to being confronted with this statement, Wells said that he was sure the last two shots were fired into Scudder with the pistol, and that Scudder was the last one he heard moaning, but that his December 17 statement could represent the way it happened.

We must now determine whether the trial court, on the basis of the above evidence, properly granted summary judgment based on the Act. We agree with the appellees that many inferences in favor of the conclusion that Odum predeceased Scudder can be drawn from the above evidence, namely, that Odum was shot several times in the head some thirty minutes before Scudder was shot, that Scudder was the victim who was gurgling blood and was shot with the pistol, and that Odum did not move while Hudgins and Wells were in the home. However, because the appellees were the movants for summary judgment, the evidence must be construed most strongly against them, and the appellant must be given the benefit of all favorable inferences and all reasonable doubts if the evidence is ambiguous or contradictory. Construing the evidence in light of these principles leads to the conclusion that the grant of summary judgment was improper.

As for which victim was moaning and gurgling blood and was shot last with the pistol, the evidence presented was ambiguous and contradictory. However, based, first, on the physical evidence, which showed that only Odum had been shot with a .22 caliber short bullet,[2] and, second, on Wells' December 17 statement to the police, it is inferrable that Odum was the victim gurgling and moaning, thus prompting the last pistol shots from Lawrance. On this summary judgment action, we must give the appellant the benefit of this favorable inference. See In re Estate of Schmidt, supra (gasping, moaning and bleeding evidence of life). Hudgins' testimony concerning the position of Odum's body was also contradictory, indicating on the one hand that he was lying mostly in the kitchen, and on the other that he was lying in the dining room. Although she may be mistaken about seeing Odum lying mostly in the kitchen, we must resolve this ambiguity in favor of the appellant for purposes of

---

[2] There is an allegation in the brief that Scudder was shot six times, and not just four, but the allegation is not supported by the record.

this summary judgment action, and doing so leads to the inference that Odum moved at some point while Hudgins was still in the house or after she left, and is consistent with him being the victim who was moaning and gurgling.

Because the above inferences indicate that Odum survived Scudder and that survivorship might be determinable, we conclude that the trial court erred in granting summary judgment based on the Simultaneous Death Act.

*Judgment affirmed in part; reversed in part. All the Justices concur.*

DECIDED MARCH 14, 1984.

*Archibald A. Farrar, Jr.,* for appellant.
*Cook & Palmour, Bobby Lee Cook,* for appellees.